951 F.2d 350
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard C. GRAVATT, Defendant-Appellant.
 No. 90-6572.
 United States Court of Appeals, Sixth Circuit.
 Dec. 27, 1991.
 
 Before KEITH and ALAN E. NORRIS, Circuit Judges; and LIVELY, Senior Circuit Judge.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Defendant, Richard Carl Gravatt, was convicted after a jury trial on seven counts of mail and wire fraud for operating a scam in which individuals were fraudulently induced to pay money to him in exchange for promises of extraordinary returns on their investments. Defendant appeals, contending that the district court erred by: (1) improperly commenting on the evidence; (2) applying a four-level increase to his sentencing offense level for being the organizer of extensive criminal activity; and (3) ordering restitution in an amount representing the losses of all individuals defrauded by his scheme when only some of the victims were listed in the indictment.
 
 I.
 
 2
 Defendant, claiming that he owned the largest "guarantor trust" in the world and that he had personal assets worth billions of dollars, convinced numerous people that he was involved in arranging loans for third-world countries from the World Bank through his organization, Imperial Trust. As explained to investors, he would arrange for a foreign country to borrow a minimum of $10 billion from the World Bank and the country would then turn over all but five percent of the loan proceeds to Imperial Trust. The country would enjoy the use of this "free money," since the trust would assume the entire loan obligation and pay it off through a process yielding vast profits and involving the purchase and sale of what defendant called "documentary letters of credit" and "prime bank notes."
 
 
 3
 The money defendant sought from the investors was said to be for paying the expense of putting together these complex international financial transactions. Investors were promised a return on their money at rates varying from 5-to-1 to as high as 20-to-1, payable out of profits generated by the proceeds of the loan from the World Bank. Investors were given promissory notes, signed by defendant, which included a false representation that he possessed sufficient personal assets to pay the notes in full.
 
 
 4
 A representative of the World Bank testified that her organization had not dealt with defendant and it would be impossible for the World Bank to be involved in the transactions that he had described to investors. A professor of accounting and business law testified that the transactions described by defendant to investors were not possible. Not surprisingly, no third-world country transaction was ever consummated. The amount committed to the 166 investors by defendant in the promissory notes totaled several million dollars, but only one or two investors received any of their money back; none received the amount promised.
 
 
 5
 Defendant enlisted the services of David Sanders and two others in carrying out the scheme. These individuals were charged in the indictment along with defendant, but, under an agreement with the government, were placed on pretrial diversion and probation in return for their testimony.
 
 II.
 A. Trial Judge's Comment on the Evidence
 
 6
 Defendant argues that the district judge improperly commented on the evidence during the cross-examination of government witness Sanders. When he was asked about his understanding of how the scheme was to work, the following colloquy ensued:
 
 
 7
 Defense Counsel: So it was not Imperial Trust actually signing for the loan?
 
 
 8
 Witness: Not to my knowledge.
 
 
 9
 The Court: Were they going to make 20 to 1 off the sale of these letters of credit, purchase of these letters of credit in order to be able to pay 20 to 1 on the money they were borrowing from these folks?
 
 
 10
 Witness: They would--according to how it was explained to me, they would make 15 percent of the $10 billion which they would call a fallout or difference between buying and selling. That 15 percent would be used to pay notes and other obligations.
 
 
 11
 Defense Counsel: Explain that to the jury.
 
 
 12
 The Court: You have asked for the impossible. We'll take a recess.
 
 
 13
 Defense Counsel: I object.
 
 
 14
 According to defendant, the judge and members of the jury began to laugh after defense counsel was told he had "asked for the impossible." Defendant argues that the district judge's comment and laughter prejudiced his cause, as the jury was left with the impression that the court found his plan inexplicable and, therefore, undercut his argument that he acted in good faith and without fraudulent intent. Following the comment, while considering a motion for mistrial outside the presence of the jury, the district judge said that the comment was in response to counsel's request that the witness explain "the most inexplicable scam I have ever seen ... how anybody could be stupid enough to pretend that this was a legitimate enterprise...." He then observed that defendant was "guilty as sin ... and so is this witness." Defendant argues that this belief was essentially communicated to the jury by the judge's comment during Sanders' testimony, thereby denying him his constitutional right to an impartial jury.
 
 
 15
 In Quercia v. United States, 289 U.S. 466 (1933), the Supreme Court held that the trial judge has a duty to use "great care" that the expression of his opinion on the evidence not mislead the jury, but stated that he "may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." Id. at 469; see also United States v. Mentz, 840 F.2d 315, 321-22 (6th Cir.1988) ("A trial judge may comment on the evidence ... if his remarks do not convey the impression that they are established truths, such that the jury may not deviate from them"). In United States v. Marion, 477 F.2d 330 (6th Cir.1973), this court reversed a conviction where the district judge commented on the credibility of a witness. We stated: "Of pivotal significance is the omission to include the cautionary instruction that, regardless of the judge's opinion, final determination of credibility of the witness is a responsibility reserved to the jury." Id. at 332.
 
 
 16
 The trial judge's comment in this case must be viewed in context. As the judge noted to counsel, the scam was in fact "inexplicable." Because, under the uncontroverted evidence, there are no such things as "documentary letters of credit" or "prime bank notes," World Bank participation was impossible and the financial transactions themselves were impossible. It follows that an explanation of the scheme was therefore impossible.
 
 
 17
 Nevertheless, the district judge regretted having made the comment and gave the following special instruction to the jury:
 
 
 18
 [E]arly on in the case I made a remark with respect to some of the testimony. I should not have done it. You must disabuse your minds of that. And please don't assume from anything I've said throughout this trial that I have any opinion whatsoever on how you ought to decide this case. You are the exclusive judges of the facts and it's entirely up to you to decide this case and disregard anything I may have said in the trial in arriving at your own findings as to the facts.
 
 
 19
 In view of the circumstances surrounding the comment, the overwhelming evidence of defendant's guilt, and this special instruction, we are unable to say that defendant's cause was prejudiced by the judge's comment.
 
 
 20
 B. Sentencing for Organizing Extensive Criminal Activity
 
 
 21
 The district judge increased defendant's sentencing offense by four levels pursuant to section 3B1.1(a) of the Sentencing Guidelines, which provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." Defendant contends that the district court made no findings of fact which would support the conclusion that his criminal activity involved four other participants or was extensive. He points out that "this guideline requires that a defendant engage in criminal activity with at least one other criminally culpable person," United States v. Carroll, 893 F.2d 1502, 1509 (6th Cir.1990), and argues that, because the jury did not convict him of the conspiracy count, the district court could not find that the other participants in the scheme were criminally culpable.
 
 
 22
 At defendant's sentencing hearing, the district judge found that "under 3(b)1.1 there may not have been five participants but the criminal activity and the organization was, quote, otherwise extensive, end quote, and a four level increase is appropriate under these circumstances." This court must accept the district court's finding unless it is clearly erroneous. United States v. Perez, 871 F.2d 45, 47-48 (6th Cir.), cert. denied, 492 U.S. 910 (1989).
 
 
 23
 The trial judge found that there was a conspiracy for the purpose of admitting into evidence the statements of other participants in the scheme under Fed.R.Evid. 801(d)(2)(E). Such a finding, like the one that a defendant organized extensive criminal activity under U.S.S.G. § 3B1.1(a), requires a determination that more than one of the participants in the scheme was criminally culpable. Carroll, 893 F.2d at 1509. Under United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074, 445 U.S. 904 (1980), a finding of a conspiracy must be supported by a preponderance of evidence, the same standard of proof required to support a finding that the defendant engaged in criminal activity with at least one other criminally culpable person under U.S.S.G. § 3B1.1(a). Carroll, 893 F.2d at 1506. The determination that defendant's scheme involved more than one culpable person is amply supported by the record. The fact that the jury did not convict him of the conspiracy count does not demonstrate otherwise; such a conviction would require proof "beyond a reasonable doubt," a substantially higher standard of proof than the "preponderance of evidence" standard required for the finding under U.S.S.G. § 3B1.1(a).
 
 
 24
 In view of the evidence that defendant organized and operated his scheme for several years with the direct aid of three subordinates, in the process victimizing over 160 people, we cannot say that the district court's finding that defendant was the organizer or leader of extensive criminal activity was clearly erroneous.
 
 C. Restitution
 
 25
 Defendant argues that the district judge exceeded his authority by ordering him to pay restitution in an amount up to $550,000, which covered losses to victims of his scheme other than those named in the indictment, and improperly delegated to the United States Probation Office the authority to determine the victims to whom restitution must be paid. The language of the court's order follows: "Restitution to be made to those who lost money, in an amount to be determined by the United States Probation Office; not to exceed $550,000.00."
 
 
 26
 The government contends that, since the indictment charged a scheme to defraud "persons" of money over a period of five years, the order for restitution properly included all victims defrauded by the scheme. The indictment names five victims, accounting for losses of $96,000. At trial, the government presented several other victims, and introduced evidence that there were over 160 victims.
 
 
 27
 In Hughey v. United States, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Supreme Court construed the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3579 and 3580 (later recodified as 18 U.S.C. §§ 3663 and 3664), to hold that a court may award restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." 495 U.S. at ----, 110 S.Ct. at 1981, 109 L.Ed.2d at 413. The Court reversed a restitution order that encompassed losses stemming from the theft and use of credit cards alleged in counts of the indictment other than the one to which the defendant pleaded guilty, even though this conduct had a "significant connection" with the crime of conviction. The Supreme Court cited the language of the Act, which provides that "a defendant convicted of an offense" may be ordered to "make restitution to any victim of such offense," 18 U.S.C. § 3663(a)(1), and stated:
 
 
 28
 [A] straight forward reading of the provisions indicates that the referent of "such offense" and "an offense" is the offense of conviction.... [T]he focus in [section 3663] on the offense of which the defendant was convicted suggests strongly that restitution as authorized by the statute is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction.
 
 
 29
 495 U.S. at ----, 110 S.Ct. at 1982, 109 L.Ed.2d at 415. The issue in the instant case is the scope of the "offense of conviction."
 
 
 30
 The Eighth Circuit recently addressed this issue in United States v. Marsh, 932 F.2d 710 (8th Cir.1991). In that case, the defendant pleaded guilty to only three counts of a multiple-count mail fraud indictment, but each of the three counts incorporated by reference all of the paragraphs describing the defendant's alleged scheme, as well as an attached list of seventy-one alleged victims. The district court held that because each count incorporated as an element of the offense the allegation that the defendant engaged in a scheme to defraud seventy-one people, it was authorized to award restitution for the total amount of loss resulting from the underlying scheme. See United States v. Marsh, 741 F.Supp. 1361, 1363 (D.Minn.1990), aff'd, 932 F.2d 710. The Eighth Circuit, however, while upholding the district court's award because the plea agreement specifically authorized the imposition of restitution for the full loss suffered by all seventy-one named victims, rejected the district court's rationale. The appeals court pointed out that footnote 2 of Hughey, describing the split in authority which the Supreme Court was resolving, cited United States v. Pomazi, 851 F.2d 244 (9th Cir.1988), which held that restitution could be required for all losses resulting from the mail fraud scheme alleged as an element of the offense even where the charging instrument providing the basis for the guilty plea only described two specific mailings. The circuit court in Marsh reasoned that because Pomazi was listed as one of the authorities holding that restitution could be ordered for offenses other than the offense of conviction, a proposition rejected by the Supreme Court in Hughey, the Supreme Court implicitly rejected the Ninth Circuit's theory in Pomazi.[1] The court further reasoned that, under Hughey, "even in an ongoing, unitary scheme, the defendant can be held liable in restitution only for the specific acts to which he pleads or is found guilty ... even though the entire scheme was incorporated by reference into each count." 932 F.2d at 712.
 
 
 31
 Defendant's indictment nowhere listed or referred to any victims other than those involved in the specific transactions enumerated in each count of the indictment. Under the rationale of Hughey, then, we hold that the restitution ordered in this case should be limited to the $96,000 accounted for by the specific transactions described in the indictment.
 
 III.
 
 32
 For the reasons stated above, the judgments of conviction and sentencing are affirmed, with the exception that we vacate the portion ordering restitution, and remand that portion to the district court for further proceedings in accordance with this opinion.
 
 
 
 [1]
 The court in Marsh stated that its analysis was supported by the Ninth Circuit's decision in United States v. Sharp, 927 F.2d 1083 (9th Cir.1991); the publication of Sharp, however, has since been withdrawn and superseded by United States v. Sharp, 941 F.2d 811 (9th Cir.1991) (recognizing that Hughey overruled Pomazi )